# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| JOHN KALIMON, derivatively on behalf of Nominal Defendant DRIVEN BRANDS HOLDINGS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> NEAL K. ARONSON, JONATHAN G. FITZPATRICK, DANIEL RIVERA, CATHERINE HALLIGAN, DAMIEN HARMON, CHADWICK HUME, RICK PUCKETT, KAREN STROUP, PETER SWINBURN, MICHAEL THOMPSON, JOSE TOMAS, and TIFFANY L. MASON, <br><br> Defendants, <br><br> and <br><br> DRIVEN BRANDS HOLDINGS, INC., <br><br> Nominal Defendant. | Civil Action No. <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff John Kalimon ("Plaintiff"), by and through his undersigned attorneys, brings this stockholder derivative complaint for the benefit of nominal defendant Driven Brands Holdings, Inc. ("Driven" or the "Company"), against current and/or former members of its Board of Directors (the "Board") and certain of its current and/or former executive officers (the "Individual Defendants", defined herein), seeking to remedy the Individual Defendants' breaches of fiduciary duties, violations of the federal securities laws, and other misconduct that resulted in material damage to the Company and its stockholders. Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, such as filings by Driven with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and other matters of public record.

## I.  INTRODUCTION

1.    This is a stockholder derivative action brought for the benefit of nominal defendant Driven against the Individual Defendants, all of whom are current and/or former officers and directors of Driven, based on their non-exculpable breaches of fiduciary duty and other serious misconduct which occurred between approximately October 2021 and August 2023 (the "Relevant Period"), as alleged in detail herein.

2.    Efforts to avoid liability for this wrongdoing have continued through the present, as the Demand Defendants (defined herein), who comprise Driven's current Board, acted in bad faith by expressly refusing to timely secure tolling agreements and preserve the Company's valuable claims despite their decision to defer a good faith, reasonable, independent investigation into Plaintiff's pre-suit demand to institute this litigation (the "Litigation Demand"), thus giving Plaintiff no choice but to file this derivative action at this time.

1

3. Nominal defendant Driven, a Delaware corporation headquartered in Charlotte, North Carolina, is the country's largest automotive care provider. This derivative action arises out of a series of materially false and misleading statements and omissions that the Individual Defendants made to stockholders concerning the Company's two most important growth initiatives during the Relevant Period: (1) the creation of a nationwide auto-glass business by rapidly acquiring and integrating smaller companies into a single "platform"; and (2) operational execution and customer retention in the Company's critical car wash business.

4. Throughout the Relevant Period, the Individual Defendants repeatedly assured stockholders that the Company was executing on both of those key growth strategies and, as such, reaffirmed highly positive earnings growth projections. With respect to Driven's auto-glass acquisition campaign, the Individual Defendants told stockholders that Driven had already successfully completed construction of its critical auto-glass platform and that the Company was making "significant progress" integrating acquired auto-glass businesses into that platform. Likewise, the Individual Defendants repeatedly touted the quality and consistency of the service provided to Driven's car wash customers, including that that the "experience for the customer is significantly better" once a car wash is integrated into the Driven network and that the Company performed "any deferred maintenance" on acquired car washes "so the equipment is working beautifully." Moreover, the Individual Defendants told stockholders that the operational initiatives implemented in the car wash segment were generating significant customer loyalty, resulting in "stickiness" of car wash revenue. And when the Individual Defendants reported declines in the Company's "same store" car wash sales, they reassured stockholders and attributed those declines to short-term headwinds and "macroeconomic" factors.

5. These statements were materially false and misleading. In truth, as the Individual

Defendants knew or should have known, a functional auto-glass platform had never been built at Driven, and even by the end of the Relevant Period, the vast majority of Driven's auto-glass acquisitions had not been integrated into that platform. In reality, fundamental and severe problems were quickly discovered in the auto-glass platform that -- as the Individual Defendants would only later be forced to admit -- stalled the "progress" of integration, putting the Company "several quarters behind" the Individual Defendants' publicly-stated timeline for it to complete the acquisition campaign. In addition, and contrary to the Individual Defendants' statements touting the Company's car wash operational depth and execution, Driven's car wash business was beset by failing equipment, poor service, and inadequate maintenance.

6.      Indeed, as alleged in the fully-sustained federal securities fraud class action against Driven and certain of the Individual Defendants captioned *Genesee County Employees' Retirement System v. Driven Brands Holdings, Inc. et al*., Case No. 3:23-cv-00895-MOC-DCK (W.D.N.C.) ("the "Securities Action"), multiple senior car wash executives reported that more than half of Driven's car washes needed major mechanical overhauls and experienced routine and significant losses of service equipment and operating capacity -- issues that were reflected in presentations delivered directly to defendant Jonathan G. Fitzpatrick ("Fitzpatrick"), a longtime Board member who at that time was also serving as Driven's President and Chief Executive Officer ("CEO"). Contrary to the Individual Defendants' statements touting the car wash segment's "sticky revenue," these issues led to massive customer attrition and competitive intrusion, and were responsible for the declining same-store sales that the Individual Defendants misleadingly blamed on other factors.

7.      Ultimately, the truth did not fully emerge until after the sudden and unexpected termination of defendant Tiffany L. Mason ("Mason"), Driven's longtime Chief Financial Officer

3

("CFO"), on May 4, 2023 -- just one day after she presented the Company's quarterly results to stockholders. *In less than two months*, defendant Mason's successor as Driven's CFO, Gary Ferrara ("Mr. Ferrara"), discovered that the Individual Defendants' public statements during the Relevant Period were untrue. Accordingly, on August 2, 2023, the Individual Defendants were forced to slash Driven's guidance by an astonishing 24% and admitted that, far from making "significant progress" in integrating its auto-glass network, the Company's integration was actually "*several quarters behind*" and, as a result, the Company would have to shrink the scope of its auto-glass network by one third. In addition, the Individual Defendants finally disclosed that the Company's substantially declining same store car wash sales were driven by "significant competitive . . . growth." Indeed, just a few weeks later, Driven's car wash segment was written down by nearly *$1 billion*, equal to more than *10% of Driven's entire asset value* as of the end of 2022.

8.      In response to these disclosures, the price of Driven stock plummeted by *41%*, causing massive losses for stockholders. But defendant Mason fared far better. Following her termination, defendant Mason -- clearly cognizant that the full truth concerning the Company's growth drivers had yet to emerge -- *dumped 68% of her Driven stockholdings in a single transaction, her first-ever Driven stock sale, just one week before the August 2, 2023 disclosures*, reaping millions in ill-gotten gains.

9.      As background, Driven was created, sponsored, and helmed by executives at Roark Capital ("Roark"), a private equity firm, and, unsurprisingly, Driven operates on a private equity "playbook." Specifically, Driven bills itself as an exceedingly effective "consolidator" in the highly fragmented automotive care industry. For the most part, Driven does not build businesses from scratch. Rather, the Company acquires smaller regional providers in various

automative segments -- car wash, auto-glass, collision, paint, etc. -- and integrates them into a single "platform" in order reap the benefits of scale, synergies, and efficiencies. Driven's central value proposition to stockholders before and throughout the Relevant Period was to deliver strong revenue and earnings growth through this process of acquisition, consolidation, and integration.

10.     At the start of the Relevant Period, the Individual Defendants announced a plan for Driven to deliver dramatic revenue growth and more than *double* its earnings through two major initiatives. The first was to grow revenue by rapidly acquiring a network of auto-glass businesses across the country. To do this, Driven would initially acquire and build a "platform" business, called Auto Glass Now ("AGN"), and would quickly "bolt-on" additional acquisitions, seamlessly integrating them into the platform business.

11.     The second major initiative was to grow earnings by driving sales and customer retention in the Company's supposedly stable car wash business, which accounted for more than 10% of all Company-wide revenue and more than 30% of the Company's earnings at the start of the Relevant Period. Driven would deliver on that earnings growth by building on its extensive network of car washes and, crucially, focus on initiatives that would engender customer loyalty and generate "sticky" -- recurring, predictable, stable -- revenue by ensuring consistent service quality across locations and offering subscription-based car wash membership programs.

12.     Throughout the Relevant Period, the Individual Defendants assured stockholders that Driven was executing on its twin engines of rapid growth: effectively integrating its auto-glass network and successfully generating customer loyalty in its car wash business through solid and consistent operational performance. With respect to the Company's auto-glass acquisition campaign, the Individual Defendants told stockholders that Driven had completed the construction of a functional auto-glass platform, AGN, and "integrated the AGN acquisition into the Driven

platform." And the Individual Defendants repeatedly assured stockholders that Driven was making "significant progress" integrating its subsequent auto-glass acquisitions into AGN.

13.     With respect to Driven's car wash business, the Individual Defendants issued numerous statements to stockholders touting the operational scope and size of the car wash business and the consistently high-quality service provided to customers through the Company's consolidated car wash platform. For instance, defendant Fitzpatrick told stockholders that "the experience for the customer is significantly better" once a car wash is integrated into the Driven network and that, as Driven was rebranding acquired car washes to its platform brand, it was performing "any deferred maintenance that was there is done, so the equipment is working beautifully"; touted "strong customer satisfaction"; and told stockholders that this operational execution was "creat[ing] stickiness with the consumer, stickiness with the cash flows, [and] predictability." Further, when the Individual Defendants reported declines in Driven's same-store car wash sales during the Relevant Period, they repeatedly reassured stockholders that any "softness" in revenue was attributable to short-term "macroeconomic conditions."

14.     Unfortunately for stockholders, the Individual Defendants' statements were untrue. First, by no later than May 2022, serious, fundamental issues with the Company's critical auto-glass platform, AGN, were discovered internally, which the Individual Defendants understood entailed significant delays to the Company's all-important integration timeline. In particular, the Driven team overseeing the auto-glass integration campaign quickly discovered that the AGN platform's Point of Sale ("POS") system, the nerve center tying together all of the financial and logistical inputs across the auto-glass network, was nowhere near adequately functional, could not effectively serve core groups of customers, including insurers, and would need to be rebuilt from the ground up -- making clear that Driven would fall behind its integration

timeline by a significant margin. Far from making "significant progress" in integration as the Individual Defendants claimed publicly, Driven fell so far behind that, even by December 2022, Driven's deadline to complete integration of the glass network, the integration process was well under 50% complete. Indeed, even by the end of the Relevant Period, integration was so incomplete that huge swaths of the Company's glass network could not communicate *at all* with the AGN platform and Driven was still unable to service an entire, and highly significant, segment of customers for the business, namely, insurers. As alleged in the Securities Action, Driven's integration progress was carefully documented inside the Company and was regularly reported to Driven's most senior executives.

15.     Likewise, per the confidential witness accounts of multiple former senior Driven executives set forth in the operative complaint in the Securities Action, contrary to the Individual Defendants' public statements touting the operation capacity and performance of Driven's car wash segment, poor service, major equipment failure, and non-existent maintenance plagued this segment, causing massive customer attrition throughout the Relevant Period. Indeed, these accounts of former senior Driven executives have confirmed that *more than half* of Driven's car washes required complete mechanical rebuilds of core equipment, and that, in December 2021, defendant Fitzpatrick received -- and did not dispute -- a report reflecting this very information. As alleged in the Securities Action, that report provided that it would take at least $40 million to address even just these mechanical issues, but on the Individual Defendants' watch and under their "leadership", Driven failed to make the necessary investments to remediate them. These operational and service failures led to significant competitive intrusion, eroding Driven's same-store car wash sales. These issues were so severe that, within months of Mr. Ferrara succeeding defendant Mason as the Company's CFO, Driven recognized that it would have to write-down its

car wash segment by nearly **$1 billion**, equal to more than **10% of Driven's entire asset value** as of the end of 2022.

16.     The truth about Driven's glass integration delays and car wash troubles began to be revealed publicly, but only in part, on October 26, 2022, when the Individual Defendants caused Driven to announce delays in its auto-glass acquisition campaign, specifically in the Company's addition of insurance customers (who, unbeknownst to stockholders, could not even be serviced through Driven's dysfunctional platform), as well as severe declines in same-store sales in Driven's car wash business. Driven's stock price declined by over 7% in response, and analysts connected the decline to the glass and car wash disclosures. But rather than reveal the true causes for the bad news, the Individual Defendants instead downplayed them, issuing a host of reassuring statements to stockholders continuing to tout Driven's purported progress in its glass and car wash strategies.

17.     Within months, in May 2023, defendant Mason was fired. No reason was given, and the termination of defendant Mason forced the Individual Defendants to postpone Driven's Investor Day conference, its first as a public company, reflecting that defendant Mason's abrupt departure was anything but part of an orderly succession. While analysts reacted with concern, the Individual Defendants assuaged fears by reiterating the guidance they had previously issued, and stockholders were comforted. Meanwhile, in July 2023, just one week before the truth would be fully revealed, and while the Individual Defendants' scheme was still artificially inflating Driven's stock price, defendant Mason liquidated approximately **$4.5 million** worth of her Company stock -- a sale of approximately **68%** of her holdings -- in her only sale as a reporting executive of Driven.

18.     Finally, on August 2, 2023, the full truth was finally disclosed. That day, the Individual Defendants **admitted** -- contrary to their drumbeat of assurances throughout the

Relevant Period that Driven's glass strategy was on track and making "significant progress" -- that the Company was actually "several quarters behind" on its glass integrations. The Individual Defendants also disclosed for the first time that the Company's declining same-store car wash sales were driven in substantial part by "competitive intrusion," which had been occurring in that segment for at least the past two years. As a result of these issues, the Individual Defendants announced that Driven would be forced to slow the pace of growth in the glass business; pause its investment into, and conduct a "thorough review" of, the car wash business; and slash the 2023 guidance the Individual Defendants had reiterated throughout the Relevant Period, including just three months earlier, just after defendant Mason's termination.

19.     On this shocking news, Driven's stock price declined by ***more than 40%***, erasing billions in shareholder value. Analysts confirmed that the news about Driven's glass and car wash businesses caused this massive stock price decline, and called into question the Individual Defendants' ability to reach the Company's 2026 goals they had characterized publicly as "conservative" just the year before.

20.     Events after the Relevant Period further confirm that the Individual Defendants misled stockholders. Within months, Driven was forced to admit that it continued to face severe delays in the glass business and was only just rolling out its POS system. Additionally, Driven announced that it was writing down its car wash business by approximately ***$850 million*** and was closing dozens of car washes.

21.     Based on these events, on December 22, 2023, Driven stockholders initiated the Securities Action against the Company, defendant Fitzpatrick, and defendant Mason in this Court. The operative complaint in the Securities Action (the "Securities Complaint"), which is based in part on detailed accounts provided by confidential witnesses, was filed on August 13, 2024, and

asserts claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of a class of stockholders who purchased Driven common stock during the "Class Period" of October 27, 2021 through August 1, 2023.[1] The defendants in the Securities Action subsequently filed a motion to dismiss, which was ***denied in its entirety*** notwithstanding the materially heightened pleading standards applicable pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), by order dated February 20, 2025. Accordingly, the Securities Action is currently proceeding towards trial.

22. Shortly after the Securities Action was sustained in its entirety, on April 21, 2025, Plaintiff issued the Litigation Demand to the Board under Delaware law, a true and correct copy of which is attached hereto at Exhibit A. Via the Litigation Demand, Plaintiff demanded that the Board undertake a reasonable, independent investigation in good faith and take action to remedy the harm caused by the misconduct described therein by any or all of the individuals identified as members of "Management".

23. Counsel for the Board, Gibson Dunn & Crutcher LLP ("Gibson Dunn"), sent a letter dated May 27, 2025 to Plaintiff's counsel in response to the Litigation Demand, a true and correct copy of which is attached hereto at Exhibit B. Gibson Dunn's May 27, 2025 letter indicated that the Board had decided to "evaluate the Demand and any additional steps that may need to be taken in response thereto after the resolution of the Securities Action." In other words, the Board had determined that it would defer any investigation or other action in response to Plaintiff's Litigation Demand indefinitely.

24. Accordingly, the next day, May 28, 2025, Plaintiff's counsel sent an email to Gibson Dunn, a true and correct copy of which is attached as part of the email chain at Exhibit C.

---

[1] All allegations herein based on or referencing confidential witness accounts are included in the Securities Complaint.

Therein, Plaintiff's counsel stated that in light of the Board's determination to defer its investigation indefinitely, "consistent with its fiduciary duties, the Board must secure tolling agreements with each member of 'Management' identified in our client's demand so as ensure that the Company's claims are preserved. The statute of limitations applicable to the Company's breach of fiduciary duty claims under Delaware law is at least arguably set to expire in October 2025 (three years after the October 2022 disclosures described in the demand). Accordingly, please let us know as soon as possible, and in any event no later than August 31, 2025, whether the Board has secured all necessary tolling agreements."

25.     On August 6, 2025, Gibson Dunn responded to the May 28, 2025 email from Plaintiff's counsel, and therein stated that in light of earlier-filed derivative actions brought by other Driven stockholders who unlike Plaintiff had not made a pre-suit demand and allege demand futility, the Board concluded there is "no need for the Company to enter into tolling agreements with any individuals." *See* Exhibit C.

26.     This determination by the Board was and is wrongful. Plaintiff's derivative claims on behalf of Driven are not protected or preserved in any way by virtue of other purported stockholders' pending derivative actions, which are potentially subject to dismissal for failure to make demand, and/or as a result of those stockholders disposing of their Driven shares and therefore lacking standing to pursue Driven's claims during or after the Board's indefinite "deferral" of Plaintiff's Litigation Demand.

27.     Claims for relief belonging to the Company are, of course, valuable corporate assets. Directors of Delaware corporations, such as Driven, are duty-bound at all times to protect and preserve the corporation's assets.

28.     The Board, in response to Plaintiff's demand that tolling agreements be timely

11

secured given the Board's indefinite deferral, has expressly refused to do so. Accordingly, the Board has either acted recklessly by failing to promptly take the reasonable, basic steps necessary to ensure Driven's claims can be timely asserted, or worse, that the Board deliberately chose to try to "run out the clock" and protect the Individual Defendants from the consequences of their misconduct.

29.     In either case, the Board's refusal to investigate at all and inform itself at this time, coupled with its refusal to secure tolling agreements despite Plaintiff's explicit demand for tolling agreements under those circumstances, amounts to a wrongful refusal of the Litigation Demand and a failure to take basic steps to protect and preserve the Company's corporate assets, in violation of the Board's fiduciary duties to Driven and its stockholders.

30.     The Board's dereliction of duty has left Plaintiff with no choice but to initiate this derivative action at this time to ensure that the Company's valuable claims for relief based on the allegations in the Litigation Demand are properly and timely asserted. Accordingly, this derivative action should proceed.

## II.     JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, as the claims asserted herein arise under Sections 14(a), 10(b), and 21D of the Exchange Act.

32.     This Court also has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

33.     In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

12

34.     This Court has personal jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

35.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) because nominal defendant Driven is headquartered in this District and conducts business in this District.

## III.     THE PARTIES

### A.     Plaintiff

36.     Plaintiff is a current shareholder of Driven and has continuously held shares of Driven common stock at all relevant times.

### B.     Nominal Defendant

37.     Nominal defendant Driven is a Delaware corporation with its principal executive offices located in Charlotte, North Carolina.  The Company's common stock trades on the NASDAQ exchange under the symbol "DRVN."

### C.     The Individual Defendants

38.     Defendant Neal K. Aronson ("Aronson") has served as a member of the Board since 2020. Defendant Aronson is also the founder of Roark and has served as Managing Partner of Roark since 2001.

39.     Defendant Fitzpatrick has served as a member of the Board since 2018 and currently serves as Non-Executive Chair of the Board. From 2012 until May 9, 2025, defendant Fitzpatrick served as the Company's President and CEO.  Defendant Fitzpatrick is named as an individual defendant in the Securities Action, and he has had federal securities fraud claims against

13

him sustained in that case.

40. Defendant Daniel Rivera ("Rivera") has served as a member of the Board and as President and CEO of Driven since May 9, 2025. Defendant Rivera joined the Company in 2012 as its Chief Information Officer, and most recently served as Driven's Chief Operating Officer ("COO") from February 2023 until May 9, 2025 before being appointed President and CEO.

41. Defendant Catherine Halligan ("Halligan") has served as a member of the Board since 2020.

42. Defendant Damien Harmon ("Harmon") has served as a member of the Board since January 2024.

43. Defendant Chadwick Hume ("Hume") has served as a member of the Board since 2020. Defendant Hume also joined Roark in 2009 and currently serves as a Principal of Roark.

44. Defendant Rick Puckett ("Puckett") has served as a member of the Board since 2020.

45. Defendant Karen Stroup ("Stroup") has served as a member of the Board since 2020.

46. Defendant Peter Swinburn ("Swinburn") has served as a member of the Board since 2020.

47. Defendant Michael Thompson ("Thompson") has served as a member of the Board since 2020. Defendant Thompson also joined Roark in 2010 and currently serves as a Managing Director of Roark.

48. Defendant Jose Tomas ("Tomas") has served as a member of the Board since July 2022.

49. Defendant Mason served as Driven's Executive Vice President ("EVP") and CFO

from 2020 until she was terminated on May 4, 2023. Defendant Mason is named as an individual defendant in the Securities Action, and she has had federal securities fraud claims against her sustained in that case.

50.     Defendants Aronson, Fitzpatrick, Rivera, Halligan, Harmon, Hume, Puckett, Stroup, Swinburn, Thompson, Tomas, and Mason are collectively referred to herein as the "Individual Defendants."

51.     Defendants Aronson, Fitzpatrick, Rivera, Halligan, Harmon, Hume, Puckett, Stroup, Swinburn, Thompson, and Tomas are collectively referred to herein as the "Demand Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

52.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interests or benefit.  Each director and officer owed to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

53.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

54.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

55.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

a.     manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b.     neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

c.     establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.     neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g. ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h. remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

56. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

## V. FACTS

### A. Driven Stockholders Were Intensely Focused on the Company's Ability to Successfully Execute on Its Acquisition and Growth-Focused Business Model

57. According to its SEC filings, Driven is "the largest automotive services company in North America with a growing and highly-franchised base of approximately 5,000 locations across 49 U.S. states and 13 other countries." Since the Company's January 2021 initial public offering (the "IPO") and throughout the Relevant Period, the Individual Defendants billed Driven to stockholders as a powerful growth engine in the "the large, recession-resistant and highly-

fragmented automotive care industry."

58. As the Individual Defendants repeatedly told stockholders, Driven operated on an acquisition model: its success depended on its ability to acquire smaller, local and regional businesses in the "highly-fragmented automotive care industry" and seamlessly integrate them into Driven's operating structure in order reap the benefits of scale, synergies, and efficiencies. Driven's central value proposition was to deliver dramatic revenue and earnings growth through this process of acquisition, consolidation, and integration. As explained in the Company's IPO prospectus filed with the SEC:

> [W]e have a proven track record of executing tuck-in acquisitions of independent market participants that are highly value accretive when integrated into our platform based on our ability to drive performance improvement post-acquisition through upfront cost synergies as well as incremental revenue growth opportunities from Driven's platform and economies of scale.

59. Moreover, the Individual Defendants told stockholders that folding these businesses into a single "highly-recognized" brand would encourage customer loyalty by providing a consistent level of service quality, enhancing revenue quality by getting the same customers to patronize outlets operated by Driven time and time again. For instance, the Individual Defendants told stockholders that consolidating smaller auto-care companies under Driven's aegis allowed the Company to provide "exceptional in-store execution," "generat[ing] . . . strong brand loyalty from our customers," and to "driv[e] consistent same store sales growth."

60. From the time of the IPO and through the Relevant Period, the Individual Defendants told stockholders that the Company had the tools and experience to execute on the acquisition-focused model at the heart of its success. For instance, Driven's IPO prospectus stated that "**M&A is a core competency of the Driven Brands platform**. We have invested in and built out a dedicated team and supporting infrastructure and processes to systematically source, diligence, acquire and integrate acquisitions." The Individual Defendants further trumpeted

18

Driven's "continued ability to pursue and execute upon scalable and highly strategic M&A as well as integrating large businesses into the Driven Brands platform," the Company's "proven track record" of successfully acquiring and integrating small, independent automotive service providers, and its "ability to pursue and execute upon scalable and highly strategic M&A." Moreover, the Individual Defendants explained that mergers and acquisitions ("M&A") would continue to be key to Driven's success: "Our track-record of highly-accretive M&A, with acquired companies benefiting from rapid growth and immediate synergies, will continue to be a significant part of the growth story for Driven Brands[.]"

61.     The Individual Defendants emphasized to stockholders the dramatic growth the Company's M&A strategy achieved. For instance, Driven's IPO prospectus trumpeted the Company's "historical success in driving revenue and profit growth," including "twelve consecutive years of positive same store sales growth through 2019, including growth through the Great Recession."

62.     The Individual Defendants told stockholders that Driven was so successful at acquiring and integrating these smaller, regional companies because it employed a powerful, reproducible, and proven "bolt-on" and "tuck-in" M&A strategy. This "bolt-on" approach was the key ingredient in Driven's M&A success. Pursuant to this strategy, Driven would purchase a "base" or "platform" business in an automotive segment -- like car wash or auto glass -- and then "bolt-on" smaller businesses, absorbing them into this developed platform. The "platform" would operate as the central nervous system of the Company's particular business segment, allowing operational control and services to flow seamlessly to -- and revenue to flow seamlessly from -- the many limbs comprising the individually acquired businesses. Throughout, and prior to, the Relevant Period, the Individual Defendants repeatedly trumpeted Driven's "bolt-on acquisition

machine" as "a consistent and repeatable M&A strategy, having completed more than 40 acquisitions since 2015." And as the Individual Defendants explained, the bolt-on strategy gave Driven a competitive advantage in successfully integrating acquired companies seamlessly into the Driven platform:

> Once a company has been acquired, we leverage our shared services to enable the acquired business to benefit from our powerful procurement programs, data analytics capabilities, and training services. Every acquisition has been integrated into Driven Brands on plan and has demonstrated improved performance by being a part of our platform rather than operating as an independent company.

63.     Importantly, the Individual Defendants explained that a **_key_** advantage of Driven's bolt-on/tuck-in strategy was speed: the Company could quickly acquire and integrate businesses, standardize and control their operations, and rapidly grow revenue. As defendant Fitzpatrick explained, Driven's strategy supposedly allowed the Company to "**_immediately_** . . . absorb[] [acquired businesses] into our base business."

64.     Analysts and stockholders understood that delivering rapid growth by acquiring smaller regional and local auto service providers, integrating them to Driven's platform, and driving operational excellence, was a core element of Driven's business model and they credited the Individual Defendants' statements touting the Company's experience, resources, and expertise in executing on this operating plan. For example, Goldman Sachs reported that Driven had "a lot of experience in integrating acquisitions," which "lower[ed] the risk associated with M&A and integration," and highlighted the Company's apparent success at delivering growth through that model, echoing the Individual Defendants' statements that same-store sales at Driven-acquired companies had been "positive for the last 12 years." Barclays also hailed "the consistency of [Driven's] model," which it explained had been "proven through comps, EBITDA growth, and M&A execution against a wide range of economic/macro backdrops," and reported that "M&A . . . should drive upside" for the Company. These analysts highlighted that Driven had "sticky

customers which drives consistency" and a "long history of achieving positive same-store sales growth, even in difficult macroeconomic environments."

65.     Similarly, Piper Sandler analysts highlighted Driven's "recurring revenue model," "12 consecutive years of positive same-store sales growth," and "successful track record" of M&A, noting the Company's "dedicated" M&A team and that it was "skilled at integrating acquisitions." And analysts at William Blair highlighted Driven's history of "highly accretive" M&A and that M&A was "embedded in the muscle of the company."

**B.     Driven's Auto Glass and Car Wash Businesses Were Critical Elements of the Individual Defendants' Promise to Deliver Dramatic Growth During the Relevant Period**

66.     In October 2021, just prior to the start of the Relevant Period, the Individual Defendants caused Driven to announce a plan to generate rapid and significant revenue and earnings growth, more than *doubling* EBITDA (Earnings Before Interest, Taxes, and Depreciation) by 2026 -- growing it from just over $350 million to at least $850 million. The Individual Defendants told stockholders that two of the three most important pillars of this growth plan were to: (1) grow revenue by rapidly acquiring a network of auto-glass businesses across the country; and (2) grow earnings by driving sales and customer retention in the Company's supposedly stable car wash business. These two key elements of the plan to generate dramatic growth played into the core of the Company's investment thesis as an industry consolidator: expanding opportunistically into fragmented markets on the one hand and delivering cash generation through a fully integrated platform on the other. Stockholders and analysts saw this plan as a key rationale for investing in the Company. William Blair, for example, told stockholders to "expect adjusted EBITDA to more than double over the next five years."

67.     In January 2022, the Individual Defendants announced the keystone of the plan to drive the Company's revenue and earnings by expanding into the U.S. auto glass market, which

the Individual Defendants stated was worth "approximately *$5 billion and growing*," a market opportunity equal to the Company's *entire* 2021 revenue. As the first step in implementing Driven's "bolt-on" M&A strategy, the Individual Defendants announced that the Company had completed the acquisition and assimilation of the "base" for its auto-glass network, a sizeable provider called Auto Glass Now. With the base for the Company's auto-glass takeover in place, the Individual Defendants told stockholders that Driven would "leverage our growth blueprint" quickly to acquire "a robust pipeline" of smaller auto-glass providers across the country, plugging them seamlessly into Driven's AGN "base" in order to "significantly accelerate our presence in this segment."

68.     Again, the Individual Defendants emphasized to stockholders that Driven's expansion into auto glass would not only significantly boost the Company's financial performance, but would do so quickly. For instance, at a February 2022 investor conference, defendant Fitzpatrick explained that the auto-glass acquisition campaign would rapidly boost revenues because the acquisitions were "simple" and the Company was successfully "leveraging" its vast acquisition-related resources and expertise. Defendant Fitzgerald explained that the auto glass acquisitions in the Company's pipeline have "a simple and differentiated operating model, a simple menu, simple building and strong unit level economics." Similarly, during an April 2022 earnings call, defendant Fitzpatrick stated that "our team is getting faster at executing the Driven Brands' playbook, and we think we'll have even more rapid progress in our glass business," adding that Driven would "leverage our growth blueprint" to "significantly accelerate our presence in this segment."

69.     Analysts and stockholders viewed Driven's auto-glass acquisition strategy as key to quickly accelerating the Company's revenue and earnings performance and characterized that

strategy as a core element of their investment thesis. For instance, Morgan Stanley analysts trumpeted Driven's auto glass campaign as "a key growth driver in an attractive, fragmented $5bn industry," with the potential to quadruple the Company's segment-wide earnings in the near-term. Likewise, in a January 2022 report, William Blair analysts raised their estimates of Driven's 2022 earnings following the Company's announcement of the AGN acquisition, stating that "[t]he highly fragmented nature of the auto glass segment provides Driven with significant opportunities for additional market share gains through both M&A and organic growth." Piper Sandler analysts likewise raised their 2022 earnings estimates for Driven in a February 2022 report, explaining that the Company "is finding strong growth opportunities with . . . its recent Glass acquisition." In another February 2022 report, William Blair analysts explained that Driven's auto glass acquisition strategy is "expected to greatly enhance Driven's presence in the U.S. auto glass market, providing an additional growth level." And, in another February 2022 report, Barclays analysts characterized Driven's auto glass acquisition campaign as among "What Matters to Us Most" about the Company.

70.    At the same time, stockholders were closely focused on the performance of Driven's supposedly stable car wash business in contributing steady growth as part of the plan to rapidly and dramatically accelerate earnings. Indeed, Driven's car wash segment was a significant component of the Company's performance, accounting for more than 10% of all Company-wide revenue and ***more than 30%*** of the Company's earnings at the start of the Relevant Period.

71.    Prior to, and during, the Relevant Period, the Individual Defendants attributed the resilience of Driven's car wash business to two things. First, the Individual Defendants touted Driven's extensive and growing network of car wash locations, calling the car wash segment "the world's largest car wash company by location count with more than 900 locations across 14

23

countries," including approximately 300 in the U.S. at the start of the Relevant Period. The Individual Defendants publicly celebrated the growth of the U.S. car wash business during the Relevant Period, regularly issuing press releases during the Relevant Period to announce the addition of new outlets.

72.    Second, the Individual Defendants touted the Company's success in engendering customer loyalty by ensuring consistent service quality across locations and providing a subscription-based car wash program to its customers that would provide unlimited washes in exchange for a membership fee. Driven's IPO prospectus, for example, labeled its car wash store count as a "key performance indicator" and explained that its subscription initiatives "foster[ed] strong customer loyalty to our stores" -- thus helping to ward off competition -- and "generate[d] predictable and recurring revenue."

73.    Analysts focused on Driven's ability to leverage its stable, recurring car wash revenue to grow earnings. Goldman Sachs analysts stated that Driven's "Subscription-based Car Wash model drives recurring revenue," and, crediting the Individual Defendants' growth strategy, noted that subscriptions currently "constitute[d] 41% of sales, and the company believes that it can add members to increase penetration to 60%." Likewise, Barclays analysts also reported that Driven's car wash subscriber base and the increase in subscribers in 2020 "speak[] to the resiliency of the segment." Credit Suisse likewise identified the "Recurring Revenue Stream" as one of the "Key Drivers" for the car wash segment.

C.    **Throughout the Relevant Period, the Individual Defendants Assured Stockholders That Driven Was Executing On Plans to Drive Rapid Growth, Successfully Integrating Its Auto Glass Network, and Delivering On Operational Performance In Its Car Wash Business**

74.    Throughout the Relevant Period, the Individual Defendants made a host of statements assuring stockholders that the Company was executing on the twin pillars of its strategy

to rapidly drive dramatic growth. First, the Individual Defendants told stockholders that Driven's auto-glass acquisition campaign was proceeding successfully and as planned: that the Company had already completed the integration of its base AGN platform and that it was effectively integrating "bolt-on" acquisitions. Second, the Individual Defendants repeatedly touted the operational performance of its car wash business, its consistent service levels and operational depth, and assured stockholders that these business initiatives were continuing to deliver customer loyalty and revenue "stickiness." Crediting these statements, analysts continued to reaffirm the Company's massive earnings growth projections and, as a result, Driven's stock price soared.

75. ***First***, the Individual Defendants repeatedly told stockholders that Driven's auto-glass acquisition campaign was proceeding as planned; that Driven had successfully completed the integration of its critical auto-glass "platform," AGN, the nerve-center for its auto-glass network; and that Driven was effectively integrating its further "bolt-on" auto-glass acquisitions into the AGN platform. For instance:

- On Driven's April 2022 earnings call, defendant Fitzpatrick assured stockholders that Driven's auto glass acquisitions were proceeding as planned, stating that Driven had already "***integrated the AGN acquisition into the Driven platform***" and that Driven had "made ***significant progress***" in continuing to integrate acquired glass businesses.

- On Driven's July 2022 earnings call, defendant Fitzpatrick stated that Driven had made "***significant progress***" on integrating its additional auto-glass acquisitions and was "very pleased with our progress in glass over the first 180 days."

- At a March 2023 investor conference, defendant Fitzpatrick assured stockholders that the AGN integration was completed, functional, and operating as planned, stating that Driven had already "***built out our North America auto glass platform***" in 2022 and had "***built*** a really nice sort of base platform in the Glass business."

- On Driven's May 2023 earnings call, defendant Fitzpatrick again assured stockholders that Driven was successfully integrating its auto-glass acquisitions as planned into a functional platform, stating that Driven had "***made significant***

*progress integrating our 10 acquisitions to create a US glass platform*."

76.     Analysts and stockholders credited the Individual Defendants' statements regarding Driven's auto-glass acquisition campaign. In a June 2022 report, Morgan Stanley analysts reported that the Company's auto-glass roll-up was "expected to be a key growth driver in an attractive, fragmented $5b industry." In another June 2022 report, William Blair analysts stated that Driven's auto-glass expansion was an "important growth driver" for the Company. In August 2022, these same analysts cited Driven's "strong momentum" in auto-glass acquisition and integration" in raising the Company's outlook. Goldman Sachs analysts also credited the Individual Defendants' statements that Driven had successfully completed its integration of AGN, reporting in July 2022 that "Glass remains a key growth focus," as "[t]he late-2021 acquisition of Auto Glass Now provided DRVN with an attractive platform to expand from." Likewise, given the Individual Defendants' statements concerning the pace and progress of Driven's acquisitions and integrations, Piper Sandler analysts stated in an October 2022 report, "We believe DRVN will have national coverage [in glass] *in a matter [of] months*, which will allow for the company to integrate its glass service offering with its existing insurance contracts across its Collision businesses," and that "[c]apturing insurance business in 2023 should *double the [total addressable market] for DRVN in glass to $5B*."

77.     **Second**, the Individual Defendants made a host of statements to stockholders touting Driven's car wash business, including specifically: (1) the operational scope and size of the car wash business; (2) the consistently high service levels provided to customers through Driven's consolidated car wash platform; and (3) that the Company's operational initiatives were generating significant customer loyalty, resulting in "stickiness" of car wash revenue. For instance:

>     •     On Driven's October 2021 earnings call, defendant Fitzpatrick touted Driven's investments in its car wash business and the resulting consistent, high-quality car wash service delivered to customers. Defendant Fitzpatrick stated that

26

Driven had "*made significant changes to improve [the car wash business']* *foundation, which has resulted in higher subscription rates and healthy same-* *store sales*," that the "Take 5 brand name *stands for . . . quality*," that Take 5 had "*industry-leading [customer satisfaction and loyalty] scores* of over 80% and repeat rates of over 70%," and that "[o]ur customers trust the Take 5 name."

• On Driven's July 2022 earnings call, in direct response to an analyst's question about the quality of service provided at Driven's car wash network, defendant Fitzpatrick touted the supposedly high level of service provided, including as a result of the Company's investments in maintenance and capital improvements. Defendant Fitzpatrick stated, "[T]he *experience for the customer* *is significantly better*" once a car wash is integrated into the Driven network, including because "*any deferred maintenance that was there is done, so the* *equipment is working beautifully*."

• During a September 2022 investor conference, defendant Fitzpatrick touted Driven's subscription car wash model as "*creat[ing] stickiness with the consumer,* *stickiness with the cash flows, [and] predictability*."

• During Driven's May 2023 earnings call, defendant Fitzpatrick touted the size and quality of the car wash business' operational capacity, stating that "scale and experience will remain a significant competitive advantage as the current environment is beginning to rationalize the competitive intensity of new entrants." Likewise, throughout the Relevant Period, the Individual Defendants repeatedly touted Driven's extensive car wash network and operating capacity, stating, for example, that the "scale and sophistication" of the brand "is truly a compounding long-term, sustainable competitive advantage which most of the industry will never achieve."

78.     Moreover, while the Individual Defendants reported declines in same-store car wash sales during the Relevant Period, they repeatedly reassured stockholders that any "softness" in revenue was caused by short-term macroeconomic "headwinds." For instance:

• On Driven's October 2022 earnings call, defendants Fitzpatrick and Mason told stockholders that declining same-store car wash sales were "*the result of the* *macro environment*."

• On Driven's February 2023 earnings call, defendant Fitzpatrick attributed declining same-store car wash sales to the "macroeconomic environment."

• Likewise, on Driven's May 2023 earnings call, defendant Mason attributed declining same-store car wash sales to "*the macroeconomic environment and poor* *weather condition[s]*."

79.     Again, analysts and stockholders credited the Individual Defendants' statements.

Analysts consistently hailed Driven's operational execution in the car wash segment, including its investments and management, as enhancing customer experience and loyalty, and therefore powering Company earnings growth. For instance, in a February 2022 report, Morgan Stanley analysts reported that Driven's car wash "acquisitions perform better under DRVN ownership and benefit from its scale and capital," and, as such, "the appropriate foundation is being laid for future growth while the industry backdrop/structure is attractive for DRVN to take share." Barclays analysts similarly Driven's "potential consolidation of systems between various Car Wash brands when/if DRVN rebrands to Take 5" as a "positive" for investors. Likewise, in a July 2022 report, Goldman Sachs analysts stated that, "[i]n our view, DRVN is taking the necessary steps to position the U.S. business for long-term success, including the decision to proceed with the Take 5 re-branding." And in a September 2022 report, those same analysts stated that "[i]n our view, [Driven's] rebranding [of car washes into its Take 5 platform] is likely to be a key driver for increased subscription penetration longer term."

### D. In Truth, Serious Flaws In Driven's Glass Platform Stalled Integration, While Driven's Car Wash Business Hemmorhaged Customers Due to the Failure to Invest In Service and Maintenance

80.     In truth, and unbeknownst to stockholders, the Individual Defendants' statements were materially false and misleading. Contrary to the Individual Defendants' statements touting Driven's "significant progress" integrating its auto-glass acquisitions, the Individual Defendants quickly discovered fundamental and severe problems in its AGN platform that -- as the Individual Defendants have now **admitted** -- stalled the "progress" of integration, more than **doubling** the Company's timeline to complete its acquisition campaign and deliver on promised growth.

81.     Likewise, contrary to the Individual Defendants' statements touting Driven's operational capacity and execution in its car wash segment -- *e.g.*, that Driven "***made significant changes to improve***" acquired carwashes and that it performed "***any deferred maintenance . . . so***

*the equipment is working beautifully*" – the Individual Defendants not only failed to make *incremental* investments in car wash service and maintenance, they allowed acquired carwashes to fall into disrepair, significantly impairing operational capacity. Accordingly, and contrary to the Individual Defendants' statements reporting that Driven's initiatives and investments in its car wash segment were yielding substantial customer loyalty and revenue "stickiness," and attributing negative results to "macroeconomic" factors, Driven was losing customers *en masse* as competition intensified over the Relevant Period.

82.     As discussed below, the Individual Defendants were forced to admit the truth regarding these two key growth drivers when, at the end of the Relevant Period, Driven's former CFO, defendant Mason, was terminated and the Company's new CFO quickly discovered these facts within weeks of taking over.

         **1.     Unbeknownst to Stockholders, Driven's Auto-Glass Acquisition Campaign Stalled, as the Company Encountered Significant and Fundamental Integration Problems Which More Than Doubled Driven's Timelines**

83.     Contrary to the Individual Defendants' statements touting Driven's "significant progress" in integrating its supposedly game-changing auto-glass acquisitions, by no later than May 2022, serious, fundamental issues were discovered internally with the Company's critical auto glass platform, AGN, that set off alarm bells within Driven and were widely understood to entail significant delays to the Company's all-important integration timeline.

84.     As alleged in the Securities Complaint based on the account of the confidential witness referred to therein as "FE-1,"[2] by January 2022, Driven's "Operations Excellence Team"

---

[2]     The Securities Complaint states that FE-1 was a senior executive in Driven's auto-glass business from shortly after the AGN acquisition closed until mid-2023. It is alleged that FE-1 was personally responsible for overseeing Driven's integrations of acquisitions, tracking progress on integrations, and issuing regular reporting on that progress that ultimately reached Michael Macaluso ("Mr. Macaluso"), the head of Driven's Paint, Collision & Glass segment and one of

formulated a plan to complete the Company's auto-glass campaign, including fully integrating all acquisitions, by the end of 2022. Mr. Macaluso issued the directives regarding the pace of integration, including the directive to complete integration of the auto-glass network by the end of 2022. Driven's plans for integration fed into its forecasting.

85.     Driven's integration progress was carefully tracked and disseminated to senior Driven executives. For instance, per the account of FE-1, the Company project-planned out every layer of integration and used a project management program to prioritize projects. FE-1 further explained that information on integration was rolled up to Mars Shah ("Mr. Shah"), the President of Driven Glass North America, in weekly progress reports, and Mr. Shah's job was to take this information up to anyone above him keeping an eye on integration, including Mr. Macaluso.

86.     Shortly after Driven acquired the AGN platform in December 2021, it was quickly discovered internally that the Company's "proven M&A playbook" did not lend itself to the auto-glass business. As FE-1 explained, Driven soon learned that each glass business in its acquisition pipeline followed a different business model, involving different revenue streams and different systems -- in part, a function of the fact that each glass business serviced different mixes of customers (*e.g.*, retail versus commercial), fleet accounts, and payor sources (*e.g.*, different insurers with disparate documentation requirements).

87.     The "nerve-center" tying all of these varying operational and financial inputs and outputs together was supposed to be a centralized "POS" sale system—a combination of hardware, software, and payment services—run through the AGN platform. A POS is central to the operation of an auto-care segment and, among other things, is responsible for compiling, storing, and transmitting all of the acquired company's revenue data. Accordingly, FE-1 explained that

---

Driven's named executive officers during the Class Period.

establishing a functional POS system is one of the first and most important steps in integrating any acquisition -- "a huge piece of the puzzle" -- and one that must be completed before much of the remaining integration can even begin. As FE-1 explained, it was widely understood within Driven that any delay in erecting a functional POS will delay the integration steps that followed it.

88.     According to the Securities Complaint, FE-1 reported that, when Driven acquired AGN in December 2021, it was immediately recognized internally that AGN's POS was archaic, would pose significant challenges to this key integration step, and that substantial changes would have to be made to the system. By May 2022, following Driven's acquisition of All Star Glass the previous month, FE-1 stated that it became even clearer to the Driven team overseeing the auto-glass acquisition campaign that there were fundamental problems and gaps in the AGN POS system that would prevent Driven from integrating the critical POS nerve center to the differently situated businesses Driven was acquiring. As an example, FE-1 explained that while AGN largely serviced cash-based retail customers, All Star Glass was focused on fleet and insurance service. Because AGN's POS had a problematic insurance portal (among other things), AGN would have serious difficulties processing payments for the vast majority of All Star Glass' business, which in turn would lead to the loss of large insurance customers.

89.     As alleged in the Securities Complaint, multiple former Driven executives and employees have corroborated FE-1's report that AGN's POS system was fundamentally flawed and created highly significant integration problems and delays. The account of the confidential witness referred to in the Securities Complaint as "FE-2"[3] corroborates FE-1's report that major issues in the AGN POS were identified at Driven virtually immediately after AGN was acquired in December 2021, and that work began to replace the system in January 2022. Echoing FE-1's

_____

[3]     The Securities Complaint states that FE-2 served as a district manager and regional manager at AGN from prior to Driven's acquisition of AGN until after the Class Period.

account, according to the Securities Complaint, FE-2 explained that as additional pipeline acquisitions closed, it became even clearer that the hodgepodge of different business systems, customer mixes, and reporting tools would necessitate a wholesale replacement of the entire platform POS system, which as discussed below, was not completed until 2023.

90.     Per the account of the confidential witness referred to in the Securities Complaint as "FE-3",[4] the outlets FE-3 oversaw as Regional Sales Manager for AGN were only 30-50% integrated on average at the end of FE-3's tenure at the Company, and there were other regions of the country that were even further behind. Moreover, FE-3 stated that there were numerous outlets in FE-3's territory that could not even access Driven's partially integrated POS system as of September 2023.

91.     As FE-1 explained, given the significant roadblocks to integration posed by AGN's unworkable POS system, Driven executives recognized by no later than May 2022 -- more than two months before defendant Fitzpatrick assured stockholders that he was "very pleased" with Driven's "significant progress" in integrating its glass acquisitions -- that the Company would fail to meet its integration goals set at the start of the year by a substantial margin. According to the Securities Complaint, within weeks of the All Star Glass acquisition, and by no later than June 2022, FE-1 recognized that the issues with AGN's POS system were so severe that an entirely new system would need to be constructed, entailing a delay of at least six months for completion of POS integration *alone*.

92.     Per the accounts of both FE-1 and FE-2 in the Securities Complaint, POS integration represents just the initial 50% of an acquisition's integration process, with progress on

---

[4]     The Securities Complaint states that FE-3 served as a Regional Sales Manager for AGN, overseeing sales at approximately 50 locations across New York, New Jersey, and Pennsylvania, from June 2023 to September 2023.

the second half largely frozen while POS integration is completed. Accordingly, by no later than June 2022, senior Driven executives understood that the fundamental issues internally discovered in AGN's POS system would likely *double* Driven's integration timeline.

93.     As discussed above, the Securities Complaint alleges that these delays were communicated from the Driven executives overseeing the auto-glass integration campaign to Mr. Macaluso and other senior Company executives. Per the account of FE-1, and as discussed above, Driven's head of North American Glass received weekly reports on integration progress and was responsible for transmitting that information to Mr. Macaluso and other senior Driven executives. As discussed below, these concerns were ultimately borne out, as Driven did not even complete its integration of the auto glass POS until the third quarter of 2023, by which time the Company was forced to slash its guidance for fiscal 2023.

94.     By the end of 2022 -- at the conclusion of Driven's timeline for completing its auto- glass integration -- Driven had still not completed its POS integration. Per FE-3's account in the Securities Complaint, even by June 2023, POS integration was only partially complete -- a fact that would be publicly confirmed months later, during the Company's third quarter 2023 earnings call in November 2023, when it was announced that Driven had only just "completed the rollout of [its] new point-of-sale system." Accordingly, even by the end of 2022—the conclusion of Driven's integration timeline -- *none* of Driven's auto-glass acquisitions had been fully integrated and, overall, the integration progress was substantially less than 50% complete, totally contrary to the Individual Defendants' public statements touting Driven's integration progress.

### 2.     Also Unbeknownst to Stockholders, the Individual Defendants Failed to Invest In Car Wash Service and Maintenance, Allowing Car Washes to Fall Into Disrepair and Severely Hampering Operational Capacity

95.     As numerous former Driven executives reported in the Securities Complaint,

adequate investments were not made in service, equipment, and maintenance in the Company's car wash business, leading to severe impairments to the segment's operating capacity. Driven executives, including defendant Fitzpatrick, were provided with reports and plans detailing the significant additional investment in car wash service and maintenance that was required. Despite agreeing with these assessments, the Individual Defendants failed to actually make the investments they acknowledged were necessary to maintain operations.

96.     The Securities Complaint alleges that the confidential witnesses referred to therein as "FE-4" and "FE-5"[5] independently reported that Driven's car wash segment was wracked by mechanical failures and maintenance problems that significantly impaired the segment's operating capacity, and that these failures were a function of the failure to adequately invest in, and budget for, adequate repairs, service, and maintenance. FE-4 reported that *75%* of Driven's more than 300 acquired car washes -- the vast majority of the Company's approximately 400 total car washes at the end of the Class Period -- required costly full mechanical equipment rebuilds, while *80%* required substantial reinvestment of some form. Likewise, FE-5 reported that Driven neglected to maintain critical, and costly, equipment at its car wash sites. Independently echoing FE-4's account, FE-5 reported that *75%* of the 150 car wash sites operated by Driven's "platform" car wash business required full mechanical equipment rebuilds, while *80%* required substantial reinvestment ranging from $15,000 to $250,000.

97.     According to the Securities Complaint, the scope and extent of Driven's service

---

[5]     The Securities Complaint states that FE-4 served as a Vice President in Driven's car wash segment overseeing national operations from April 2022 through May 2023, and that FE-5 was also a Vice President in Driven's car wash segment, serving from prior to the start of the Class Period until early 2022. During FE-5's tenure, FE-5 is alleged to have overseen facilities and maintenance operations nationally for Driven's car wash group. It is further alleged that FE-5 personally set up the national maintenance team, and as such was "intimately" familiar with the asset quality at each location.

and maintenance failures were communicated directly to defendant Fitzpatrick. FE-5's account detailed these failures, including the fact that 75% of Driven's platform car washes required wholesale mechanical rebuilds, in a three-year plan FE-5 prepared for restoring equipment to the performance level needed to service customers. This plan called for a substantial $40 million investment in equipment repair alone. It is alleged that in December 2021, FE-5 personally presented this report to defendant Fitzpatrick and discussed it with him, and that defendant Fitzpatrick did not dispute the report's findings. To the contrary, according to the account of FE-5, defendant Fitzpatrick remarked, "Wow, it sounds like we should have done better due diligence when we took over" Driven's car wash platform. FE-5 additionally reported that defendant Fitzpatrick approved the costly maintenance plan on December 19 or 20, 2021, but the plan was never implemented and the money was diverted to other uses.

98.     Likewise, according to the Securities Complaint, FE-4 explained that categorical maintenance freezes were routinely put in place in the Company's car wash segment in order to cut costs and boost earnings, and that defendant Fitzpatrick received bi-monthly P&L (profit and loss) reports discussing maintenance cuts.

99.     The accounts in the Securities Complaint of the confidential witnesses referred to therein as "FE-6", "FE-7", "FE-8", and "FE-9"[6] corroborate the accounts of FE-4 and FE-5, as

---

[6]     The Securities Complaint states that FE-6 was one of eight Regional Directors of Driven's car wash business from June 2022 through July 2023, and covered states including Missouri, Arkansas, Oklahoma, Tennessee, Mississippi, Louisiana, and Colorado. The Securities Complaint states that FE-7 was, from June 2022 through April 2024, a District Manager in Colorado, which was part of the Mountain West region that had the highest cash flow in the Company, with the region accounting for 30% of Company cash flow in the car wash segment, and that FE-7 oversaw the most lucrative district in the region, consisting of eight stores. The Securities Complaint states that FE-8 was a District Manager in Texas for Driven's car wash group from prior to the start of the Class Period through early 2022, and also oversaw eight car washes. And the Securities Complaint states that FE-9 served as a District Manager from December 2018 through December 2023, and that FE-9's district included 19 car washes in Indiana, Michigan, and Wisconsin.

FE-6, FE-7, FE-8, and FE-9 each explained that major equipment failures at Driven car washes were routine and significantly impacted operating capacity, but, nevertheless, the Company failed to make the necessary investments in equipment and maintenance. Indeed, FE-8 reported that, at any given time during FE-8's tenure at Driven, at least half of the car washes FE-8 oversaw had some significant mechanical failure. FE-6 and FE-7 echoed this, explaining that the maintenance budget was so tight that essential maintenance frequently was not performed. For example, FE-7 reported that the Company's maintenance teams were so far behind that they took months to fix tunnels and that, at any given time, every location FE-7 oversaw had at least some equipment that was not functioning, while FE-6 reported that there were multiple car wash locations in FE-6's region that would have an entire wash tunnel that was non-operational for significant periods -- not infrequently in locations with only two tunnels to begin with -- which ate significantly into the location's projected sales volume. Similarly, FE-9 corroborated FE-4's report regarding routine maintenance freezes, and cited as examples a complete fourth-month freeze beginning in November 2022 and an at least three-month freeze implemented in September 2023.

100.    The failure to invest in equipment, maintenance, and service had a direct and highly adverse impact on customer retention and same-store sales. As a result, the largest driver of Driven's declining same-store car wash sales was not "macroeconomic" conditions, as the Individual Defendants publicly claimed, but rather competitive intrusion -- the loss of business to more reliable, higher quality providers -- as former Driven employees explained in the Securities Complaint.

101.    According to the Securities Complaint, FE-4 reported that maintenance and quality issues were driving customer attrition and declining same-store sales. Per FE-4's account, the negative impact of competitive intrusion on Driven's car wash business became increasingly

significant and dire beginning in 2021, even prior to the start of the Class Period, and Driven could easily see a 20% drop in revenue at a car wash when even a single competitor moved into the area. It is alleged that in 2022, FE-4 reported to John Teddy, the President of Driven's platform car wash business and one of the Company's named executive officers during the Class Period, that competitive intrusion was an "all hands" problem and that the segment needed a "gameplan for competitive intrusion going into 2023." The Securities Complaint alleges that the accounts provided by FE-7, FE-8, and FE-9 each independently corroborated FE-4's report, as those three confidential witnesses explained that in the regions they oversaw, customer attrition was significant and poor service quality was the single biggest driver of that attrition.

### E.    The Truth Emerges

102.    As detailed below, the truth about Driven's supposed twin growth engines -- its auto-glass acquisition campaign and its car wash business – was revealed to stockholders through two corrective disclosures, in October 2022 and August 2023.

103.    First, on October 26, 2022, the Individual Defendants announced delays in the Company's ability to generate auto-glass revenue and poor car wash results. While the Individual Defendants continued to issue a slew of misleading statements designed to assuage stockholders' concerns, they were finally forced to disclose the truth soon after defendant Mason was suddenly and abruptly terminated from her position as Driven's CFO. Significantly, defendant Mason dumped ***68% of her Driven stock*** following her termination, in her ***first-ever sale***, suggesting that she knew that the full truth concerning the Company's key growth drivers would soon emerge. Then, on August 2, 2023, just three months after Driven's new CFO assumed his role, the Individual Defendants finally disclosed that: (i) they were slashing Driven's guidance for fiscal 2023 due to significant delays in its auto glass integration, and (ii) same store sales in the Company's car wash business were declining -- not because of short-term "macroeconomic

37

conditions," as the Individual Defendants had claimed during the Relevant Period, but because the business was losing customers on a substantial scale to competitors.

                **1.**      **On October 26, 2022, the Individual Defendants Announce Delays In Driven's Glass Business and Poor Car Wash Results**

104.     On October 26, 2022, the Individual Defendants caused Driven to issue its third-quarter 2022 earnings release and hold its earnings call. The Individual Defendants reported surprising and disappointing news in the Company's car wash and glass businesses. With respect to Driven's glass business, the Individual Defendants disclosed delays in the auto-glass segment's ability to service insurers, a key source of revenue. On Driven's earnings call, defendant Fitzpatrick acknowledged that Driven's auto-glass business was still ***a year away*** from being in a position to service insurers, which would not be added until "late 2023 and 2024." This was particularly disappointing news to stockholders; as one analyst noted on Driven's earnings call, "a lot of investors are eager for you to open up that insurance opportunity" because it would "probably double the TAM [total addressable market]." With respect to Driven's car wash business, the Individual Defendants announced, for the first time, that same-store sales in the car wash segment had ***declined*** 3.4% year-over-year even ignoring foreign exchange issues (with a further 5.6% decline attributable to such issues for the international car wash business).

105.     In response to the disclosures on October 26, 2022, Driven's stock price fell from a close of $32.27 per share on October 25, 2022 to close at $29.96 per share on October 26, 2022, a decline of over 7%.

106.     Analysts noted that these negative announcements would likely surprise and disappoint Driven stockholders. For instance, in an October 26, 2022 report, Goldman Sachs analysts stated that the delay in Driven's auto-glass business's ability to generate insurance revenue "may have surprised some investors that expected insurance growth within the business

sooner." Likewise, in October 27, 2022 reports, Morgan Stanley analysts stated that the car wash segment's underperformance "could continue weighing on sentiment into '23" and that "ex FX comps of -3.4% were likely below expectations" and analysts from J.P. Morgan noted "[s]igns of pullback in US Car Wash" and that the "step down was notable vs. 2Q."

107.　The Individual Defendants, however, continued to issue false and misleading statements in an effort to temper market reaction and assuage stockholders' concerns. Rather than admit there were widespread delays in auto-glass integration, including those caused by a non-functional POS system that prevented Driven from servicing insurers, the Individual Defendants told stockholders that Driven was simply prioritizing retail and commercial revenue streams and "being appropriately prudent in sort of the timing of unlocking that insurance opportunity." Moreover, the Individual Defendants continued to assure stockholders that Driven was making "significant progress" in integrating its auto-glass business.

108.　Likewise, rather than admit that Driven's car wash business was experiencing substantial customer attrition and competitive pressure (driven by poor service quality and impaired operating capacity), the Individual Defendants attributed declining same-store car wash sales to the "macro environment." Moreover, the Individual Defendants stated that the car wash business's "retention rate has remained steady" and that car wash patrons were "proving to be a sticky customer."

109.　While analysts were disappointed by the negative news, they credited the Individual Defendants' misleading and soothing statements. For instance, JPMorgan reported that Driven's management attributed car wash same-store sales declines to "lower US retail volumes due to softening macro conditions" and highlighted the branding steps the Company had taken to retain customers. Similarly, Morgan Stanley cited the Individual Defendants' explanations for the

slowdown in the car wash business and gave Driven an "Overweight" rating, while J.P. Morgan urged investors to "[f]ight the [n]oise!" and stated that it was "[e]xpecting a [q]uick [b]ounce" and that the "[l]ong-[t]erm [s]tory [was] [g]etting [b]etter," including because Driven was making "notable progress on [its car wash] re-brand" and "[t]he glass furnace is hot!"

110.    In the months that followed, the Individual Defendants continued to issue soothing statements to stockholders. For example, with respect to the Company's glass business, during Driven's February 22, 2023 earnings call, defendant Fitzpatrick stated that Driven "did a phenomenal job in 2022 building out [the glass] platform from zero to becoming the second largest player in the United States," while he claimed on the May 3, 2023 earnings call that Driven had "combined the best processes, procedures, and technology to inform our standard operating model that has been rolled out across the entire footprint." And with respect to the car wash business, on both calls, defendants Fitzpatrick and Mason continued to attribute poor results to transient factors outside of Driven's control, including macroeconomic issues and the weather.

111.    Analysts continued to credit these statements from the Individual Defendants. For example, after Driven's February 2023 earnings call, Piper Sandler reported that there was "[l]ight at [e]nd of [t]unnel," for the car wash business because its "headwinds should abate meaningfully in 2H 2023." Similarly, Barclays issued a report around that time stating that Driven's "Glass story" was "on track." And after the May 2023 earnings call, J.P. Morgan reported that "management [had] indicated roughly half of the 300-bp slowdown in constant-currency Car Wash was due to a softer macro (the other half being weather)," while Barclays again reported that Driven's "Glass story" remained "on track."

## 2. Defendant Mason Is Abruptly Terminated and Driven's Inaugural Investor Day Conference Is Cancelled

112.    On May, 8, 2023, just days after the Individual Defendants assured stockholders

that Driven had "integrated our glass businesses" and that Driven's "scale and experience w[ould] remain a significant competitive advantage" in the car wash segment, the Individual Defendants shocked stockholders by announcing the sudden termination of the Company's CFO, defendant Mason, on May 4, 2023, just one day after Driven reported its financial results for the first quarter of 2023. This announcement came just two weeks before the Company's inaugural Investor Day conference was scheduled, on May 23, 2023 -- but the conference was postponed until September 2023 "due to the Company's recent CFO transition." The Individual Defendants nonetheless reaffirmed the 2023 guidance they had issued on May 3, 2023. It was also announced that Mr. Ferrara would succeed defendant Mason as Driven's CFO, effective May 10, 2023.

113. Significantly, following defendant Mason's termination, but before the full truth concerning the Company's supposedly key growth drivers emerged (as discussed below), defendant Mason dumped *68% of her Driven stock* in a single transaction on July 26, 2023, selling over 165,000 shares for proceeds of *$4.46 million*. This was her *first-ever sale*, and it came just one week before the truth would be fully revealed.

### 3. On August 2, 2023, the Individual Defendants Disclose Significant Delays in Glass Integration and Continuing Declines in Car Wash Same-Store Sales

114. On August 2, 2023, just *two months* after Driven's new CFO was installed, the Individual Defendants were finally forced to disclose the truth about Driven's key growth drivers, the auto-glass and car wash businesses. First, during the Company's earnings call held that day, the Individual Defendants admitted that contrary to their repeated soothing statements describing Driven's progress in its auto-glass strategy, the Company's integrations in that segment were was "*several quarters behind*" and "*not going as quickly as planned*." Given this, the Individual Defendants announced that the Company would significantly reduce the scope of its glass

acquisition campaign and slash its new glass unit store growth for 2023 by approximately one-third, from 130 down to 90, in order to "get the integration completed."

115.     The Individual Defendants also announced a further 4% year-over-year same-store car wash sales decline. Contrary to the Individual Defendants' prior statements touting the "stickiness" of Driven's car wash revenue and attributing declining sales to "macro economic" factors, the Individual Defendants were finally forced to acknowledge that falling same-store sales were driven by "significant competitive . . . growth" over the prior two years -- and thus that Driven was actually losing substantial numbers of customers to these competitors.

116.     Given the severe problems affecting the Company's two key growth drivers, the Individual Defendants slashed Driven's 2023 earnings per share (EPS) guidance by an astonishing *24%*, despite having reaffirmed prior guidance just two months earlier after defendant Mason's abrupt departure.

117.     Significantly, the Individual Defendants' statements demonstrated that the Company's issues in glass and car wash were hardly new. With respect to glass, when shocked analysts asked why the Individual Defendants were only just disclosing that Driven was "several quarters behind," given that those problems would have had to be "emerging" for some time, defendant Fitzpatrick effectively *admitted* that there had been no significant external developments that changed the progress or outlook for either business, but rather that Driven's new CFO had looked at the *same facts known to the Individual Defendants during the Relevant Period* and had discovered, in less than two months, that the Individual Defendants' public statements were not accurate. Specifically, defendant Fitzpatrick pointed to defendant Mason's termination and replacement by Mr. Ferrara "60-or-so days ago," which had provided "a chance for [Mr. Ferrara] with a fresh set of eyes to look at the business, to look at the assumptions" and determine that

"we're probably a little bit behind where we want to be." And with respect to the car wash segment, the Individual Defendants admitted that the competitive intrusion issues had been building over "the last two years"—*i.e.*, since 2021.

118. These disclosures caused the price of Driven's stock to plummet by *41%*, or $10.63 per share, from a close of $25.83 per share on August 1, 2023 to close at $15.20 per share the next day.

119. Analysts reacted with shock and disappointment to the August 2, 2023 disclosures. Credit Suisse analysts, for instance, downgraded Driven stock due to"[t]oday's results—including a worse than anticipated slowdown in the car wash segment [and] unexpected integration challenges in the glass space" and stated that Driven's long-term EBITDA target "may prove to be overly optimistic."

120. William Blair analysts also downgraded Driven's stock, explaining that "Weakness in two Key Growth Pillars Clouds Visibility" and reporting that "the company materially cut its 2023 outlook on weakness in Car Wash (softer U.S. demand) and auto glass (integration delays)." They further explained: "Both segments represent key growth pillars for Driven and raise questions about how quickly and deeply the businesses have turned (Driven reiterated its outlook as recently as mid-May) and whether the company's diversified business model also translates into enhanced execution risk." William Blair further explained that the car wash and glass disclosures "call[ed] into question" Driven's ability to hit its 2026 earnings estimates. Likewise, Goldman Sachs analysts reported on the delays in Driven's glass integrations, stating that "[t]he integration of the US glass business is behind schedule, and management cited a high level of complexity with integrating the numerous acquisitions that make up the business" and noting that "the delayed integration is expected to weigh on margins in the near term, while

timing for the completion of the integration remains unclear" and that "until further clarity is provided, we believe the . . . uncertainty regarding the completion of the US glass integration is likely to weigh on sentiment." With respect to Driven's car wash business, these analysts worried that the Company's newly disclosed "increased competitive pressures could drive promotional intensity and pricing pressures, potentially weighing on long-term margins."

121.　Subsequent events would only further confirm that the Individual Defendants knew or recklessly disregarded the truth about Driven's glass and car wash businesses during the Relevant Period, and that their public statements to stockholders during the Relevant Period were materially false and misleading.

122.　On September 20, 2023, Driven finally held the Investor Day event that it had been forced to reschedule from May 2023 after the abrupt firing of defendant Mason. During that event, defendant Fitzpatrick once again acknowledged that the auto-glass integration delay the Individual Defendants announced in August 2023 was not caused by some sudden and unforeseeable event, but, instead was a function of facts known to the Individual Defendants throughout the Relevant Period, including that Driven had "[taken] on a lot of integration involving a 1,000 employees, multiple businesses and multiple operating models," which "was a lot," and admitted that Driven "should have gone slower."

123.　Moreover, the Individual Defendants' acknowledgments further made clear that Driven's auto-glass integration problems were widespread and severe, and thus could not have reasonably escaped the Individual Defendants' attention during the Relevant Period. For instance, defendant Fitzpatrick disclosed that integration was so stymied that Driven would pause adding new units to its auto glass platform ***until 2025*** in order to focus on integration.

124.　Just one month later, during Driven's November 1, 2023 earnings call, defendant

Rivera, who at that time was serving as Driven's COO, admitted that the glass business "integration challenges have resulted in underperformance of our US glass business in 2023" and reiterated that the Company was forced to slow growth in this segment as a result. Defendant Rivera further stated that the Company had only *just* completed its rollout of AGN's new POS system and that the Company expected it would not complete integration until the first quarter of 2024—well over a year beyond the Company's integration timeline during the Relevant Period.

125.    With respect to Driven's car wash business -- and in contrast to the Individual Defendants' Relevant Period statements touting the Company's operational execution and blaming falling sales on "macro economic" factors – defendant Fitzpatrick acknowledged at Driven's September 2023 Investor Day conference that Driven's car wash "performance is not acceptable," explaining that Driven had to "fix it or think differently about the long-term." Then, during the November 1, 2023 earnings call, Driven announced a massive *$851 million write-down* for its car wash segment -- amounting to more than 10% of Driven's entire asset value as of the end of 2022 -- after "assessing underperforming stores and their local competitive environment." Driven further announced it would close dozens of its stores and pause opening new ones. Again, Driven did not claim that some sudden, cataclysmic event led to this write-down, but, rather, acknowledged that it was a function of underperformance and competitive pressure, which, as discussed above, numerous former Driven executives reported in the Securities Action was highly significant throughout the Relevant Period.

126.    Analyst commentary following the end of the Relevant Period is telling. For instance, following Driven's September 2023 Investor Day conference, Barclays analysts remarked:

> ***There has been a significant shift in the narrative on DRVN in recent months***; this has gone from a company that had executed very well since going public,

generally exceeding expectations and gaining share in a favorable consumer segment, to more recently one that has moved too quickly, struggled with execution, and is facing competitive issues.

127. Driven's stock price has never recovered from these events, and currently trades at less than $17 per share.

## VI. THE INDIVIDUAL DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

128. During the Relevant Period, the Individual Defendants made a series of false and misleading statements to stockholders concerning Driven's car wash and glass businesses. The Individual Defendants' materially false and misleading statements are set forth in full below, along with a summary of the material facts that the Individual Defendants withheld from stockholders that rendered their statements materially false and misleading.

### A. False and Misleading Statements About Driven's Car Wash Business

129. Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements to stockholders concerning Driven's car wash business, specifically: (1) the operational scope and size of the car wash business; (2) the consistently high service levels provided to customers through Driven's consolidated car wash platform; (3) that the Company's operational initiatives were generating significant customer loyalty, resulting in "stickiness" of car wash revenue; and (4) attributing Driven's negative same-store car wash sales to short-term headwinds, including "macro economic" conditions.

#### 1. Materially False and Misleading Statements During the Fourth Quarter of 2021

130. On Driven's October 27, 2021 earnings call, defendant Fitzpatrick stated that Driven was "committed to having the best stores" and "to offer[ing] customers the best experience" in the car wash business. Defendant Fitzpatrick further stated that Driven's car wash brand "stands for . . . quality."

46

131.     These statements were materially false and misleading. It was false and misleading for the Individual Defendants to tout Driven's "commit[ment] to having the best stores" and to "offer[ing] customers the best experience," and that Driven's car wash brand "stands for . . . quality" when, in truth, (i) Driven's car wash business suffered from pervasive equipment failures and poor service; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and (iii) Driven's car wash business was experiencing significant customer loss, competitive intrusion, and declining same-store sales as a result of these operational failures.

132.     On November 1, 2021, the Individual Defendants caused Driven to issue a press release touting the car wash segment's operating capacity, stating that Driven had "over 300" car washes in the U.S. and that Driven was "the fastest-growing express conveyor car wash operator in North America."

133.     These statements were materially misleading. It was misleading for Defendants to tout the operating capacity of Driven's car wash segment when, in truth, (i) a majority of those locations suffered from suffered from pervasive equipment failures and poor service that prevented them from adequately servicing customers, leading to significant customer attrition and declining same-store sales; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and (iii) Driven's car wash business was experiencing significant customer loss, competitive intrusion, and declining same-store sales as a result of these operational failures.

### 2.     Materially False and Misleading Statements During the First Quarter of 2022

134.     During Driven's February 16, 2022 earnings call, an analyst specifically asked the Individual Defendants about Driven's investment in upgrading car wash equipment in order to

attract and retain customers. In response, defendant Fitzpatrick stated, "we are continuing to invest into the existing asset base as well specifically to upgrade equipment, to add maybe incremental components to that equipment package, which then helps driving incremental new customers."

135.    These statements were materially false and misleading. It was false and misleading for the Individual Defendants to state that Driven was "continuing to invest into the existing asset base" and "specifically" was "upgrad[ing] equipment" "which then helps driving incremental new customers" when, in truth, (i) Driven's car wash business suffered from pervasive equipment failures and poor service; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and (iii) Driven's car wash business was experiencing significant customer loss, competitive intrusion, and declining same-store sales as a result of these operational failures.

### 3.    Materially False and Misleading Statements During the Second Quarter of 2022

136.    On May 25, 2022, the Individual Defendants caused Driven to issue a press release touting the car wash segment's operating capacity, stating that Driven was "continu[ing] its growth trajectory" and had "celebrated another significant milestone – opening its 350th express car wash."

137.    These statements were materially misleading. It was misleading for the Individual Defendants to tout the operating capacity of Driven's car wash segment when, in truth, (i) a majority of those locations suffered from suffered from pervasive equipment failures and poor service that prevented them from adequately servicing customers, leading to significant customer attrition and declining same-store sales; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and (iii) Driven's car wash business was experiencing significant

customer loss, competitive intrusion, and declining same-store sales as a result of these operational failures.

### 4. Materially False and Misleading Statements During the Third Quarter of 2022

138. On Driven's July 27, 2022 earnings call, a securities analyst asked the Individual Defendants how customer experience and satisfaction changed at Driven's car washes as a result of being integrated into the Company's Take 5 platform. Defendant Fitzpatrick responded: "[T]he experience for the customer is significantly better pre and post . . . rebranding," including because "any deferred maintenance that was there is done, so the equipment is working beautifully."

139. These statements were materially false and misleading. It was false and misleading for the Individual Defendants to tout the Driven customers' "significantly better" experience at Driven car washes and to stated that "any deferred maintenance that was there is done, so the equipment is working beautifully," when, in truth, (i) Driven's car wash business suffered from pervasive equipment failures and poor service; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and (iii) Driven's car wash business was experiencing significant customer loss, competitive intrusion, and declining same-store sales as a result of these operational failures.

140. On September 7, 2022, defendant Fitzpatrick attended the Goldman Sachs Global Retailing Conference on behalf of Driven. At that conference, defendant Fitzpatrick touted Driven's subscription car wash business and stated that "it creates stickiness with the consumer, stickiness with the cash flows, predictability."

141. This statement was materially misleading. It was materially misleading to tout the "stickiness" and "predictability" of Driven's subscription revenue when, in truth, (i) Driven's car

wash business suffered from pervasive equipment failures and poor service; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and (iii) Driven's car wash business was experiencing significant customer loss, competitive intrusion, and declining same-store sales as a result of these operational failures.

### 5. Materially False and Misleading Statements During the Fourth Quarter of 2022

142.     On Driven's October 26, 2022 earnings call, after Driven posted negative same-store sales growth in the car wash segment, defendant Fitzpatrick stated that Driven "did experience some headwinds in the third quarter related to . . . softening retail volume as the result of the macro environment." At the same time, defendant Mason reassured stockholders about Driven's car wash business and touted the car wash segment's "sticky" revenue and customer retention. Defendant Mason stated that Driven "continue[d] to grow our Wash Club program" which was "not only a great recurring revenue stream that provides a level of predictability to this business, but it is also proving to be a sticky customer."

143.     These statements were materially misleading. It was misleading for the Individual Defendants to attribute Driven's same-store sales declines to the "macro environment," and to tout Driven's "grow[ing]" car wash business and its "sticky customer," when, in truth, (i) Driven's car wash business suffered from pervasive equipment failures and poor service; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and (iii) Driven's car wash business was experiencing significant customer loss, competitive intrusion, and declining same-store sales as a result of these operational failures.

144.     On December 6, 2022, during the Morgan Stanley Global Consumer Conference

defendant Fitzpatrick referred to competition as only "a small piece" of the "weakness" in the Company's car wash segment.

145.    This statement was materially false and misleading. It was materially false and misleading to state that competition as only "a small piece" of the "weakness" in the car wash segment when, in truth, (i) Driven's car wash business suffered from pervasive equipment failures and poor service; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and (iii) Driven's car wash business was experiencing significant customer loss, competitive intrusion, and declining same-store sales as a result of these operational failures.

### 6.    Materially False and Misleading Statements During the First Quarter of 2023

146.    On Driven's February 22, 2023 earnings call, after the Individual Defendants reported negative same-store sales growth in the car wash segment, defendant Fitzpatrick stated that the Company's poor car wash results were caused by "softer retail volume, as a result of the macroeconomic environment." At the same time, defendant Fitzpatrick reassured stockholders about Driven's car wash business, touting the segment's operating scale and service quality as providing significant competitive advantages. Defendant Fitzpatrick stated that Driven's "scale and experience will remain a significant competitive advantage" and touted Driven's "significant network benefits that deepen our competitive moat and differentiate our business."

147.    Likewise, on that same call, defendant Mason also reassured stockholders about Driven's car wash business, stating that the Company "continued to . . . grow our subscription [car wash] program" and that it was "a great recurring revenue stream that provides a level of predictability to this business," and that was "not only a great recurring revenue stream that provides a level of predictability to this business, but it's also proving to be a sticky customer and

an important focus for Driven Brands."

148.     These statements were materially misleading. It was misleading for the Individual Defendants to attribute Driven's same-store sales declines to the "macroeconomic environment"; to state that the car wash subscription business "continue[d] to grow" and provided "a great recurring revenue stream" and "a sticky customer"; and to tout the car wash segment's "scale and experience" and "significant network" as competitive advantages when, in truth, (i) Driven's car wash business suffered from pervasive equipment failures and poor service; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and (iii) Driven's car wash business was experiencing significant customer loss, competitive intrusion, and declining same-store sales as a result of these operational failures.

149.     On March 29, 2023, the Individual Defendants caused Driven to issue a press release touting the car wash segment's operating capacity, stating that Driven had "more than doubled its total footprint since Driven Brands entered in the car wash business in August 2020" and had "celebrated the grand opening of its 400th car wash."

150.     These statements were materially misleading. It was misleading for the Individual Defendants to tout the operating capacity of Driven's car wash segment when, in truth, (i) a majority of those locations suffered from suffered from pervasive equipment failures and poor service that prevented them from adequately servicing customers, leading to significant customer attrition and declining same-store sales; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and (iii) Driven's car wash business was experiencing significant customer loss, competitive intrusion, and declining same-store sales as a result of these operational

failures.

### 7. Materially False and Misleading Statements During the Second Quarter of 2023

151.    On Driven's May 3, 2023 earnings call, after Driven again posted negative same-store sales growth in the car wash segment, defendant Fitzpatrick attributed that result to "softer retail volume as a result of the macro environment" but stated that Driven's "scale and experience will remain a significant competitive advantage as the current environment is beginning to rationalize the competitive intensity of new entrants" Likewise, defendant Mason stated that "retail volume was soft again this quarter as a result of the macroeconomic environment and poor weather condition." Defendant Mason further stated: "[W]e attribute the softness over the last few quarters to both the macroeconomic environment and then this quarter, in particular, to poor weather conditions in . . . the US." She also stated that "we've seen macroeconomic pressure specifically in the car wash business since about Q2 of last year" in the U.S. and that "in Q1, it's probably equal parts, continued macroeconomic pressure, and then . . . the poor weather conditions."

152.    These statements were materially misleading. It was materially misleading for the Individual Defendants to attribute Driven's same-store sales decline to the "macroeconomic environment" and "weather," and to tout growing Driven's "competitive advantage" in the car wash business when, in truth, (i) Driven's car wash business suffered from pervasive equipment failures and poor service; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and (iii) Driven's car wash business was experiencing significant customer loss, competitive intrusion, and declining same-store sales as a result of these operational failures.

### B. Materially False and Misleading Statements About Driven's Auto Glass Acquisition Campaign

153.    Throughout the Relevant Period, the Individual Defendants made a series of false

and misleading statements concerning Driven's auto glass business and acquisition campaign. The Individual Defendants told stockholders that the Company's auto-glass acquisition campaign was proceeding as planned; that Driven had successfully completed the integration of its critical auto-glass "platform," AGN -- the nerve-center for its auto-glass network; and that Driven was effectively integrating its further "bolt-on" auto-glass acquisitions into the AGN platform.

### 1. Materially False and Misleading Statements During the Second Quarter of 2022

154. On Driven's April 27, 2022 earnings call, defendant Fitzpatrick stated that Driven had "made significant progress" in its glass strategy and that he was "very pleased with our progress over the first 90 days." He further stated that Driven was "making good progress with Driven's existing . . . insurance partners and introducing them to our glass capabilities." Likewise, defendant Mason touted Driven's progress in integrating its auto-glass business, stating that Driven's "proven M&A playbook" was "delivering" in its "glass businesses."

155. These statements were materially false and misleading. It was false and misleading for the Individual Defendants to state that Driven had made "significant progress" in integrating its auto-glass business; that Driven's "proven M&A playbook" was "delivering" in acquiring, integrating, and consolidating the auto-glass platform; and that Driven had made "good progress" in attracting insurance customers to "our glass capabilities" when, in truth, (i) Driven's auto-glass integration was beset by severe problems, including fundamental deficiencies in the critical platform POS system, that significantly expanded Driven's integration timeline and prevented it from adding or servicing many important customers, including insurers; (ii) AGN's POS system, the erection of which was a critical gating step to further integration, would have to be rebuilt from scratch, causing significant delays in integration and, thus, in growth and profitability; (iii) even once the POS system was constructed, which would not be completed until

after Driven's deadline to complete all integration, integration would still only be 50% complete; and (iv) these delays were having a significant negative impact on the auto-glass business' performance because huge swaths of the Company's acquired businesses could not even communicate with the AGN platform, Driven was unable to service key customers thus losing present and prospective business, and Driven was unable to integrate its new acquisitions, which negatively impacted revenue and earnings growth.

### 2. Materially False and Misleading Statements During the Third Quarter of 2022

156.    On Driven's July 27, 2022 earnings call, defendant Fitzpatrick stated that he was "very pleased with our progress in glass over the first 180 days" and again stated that Driven was "making good progress with Driven's existing . . . insurance partners and introducing them to our glass capabilities," while defendant Mason again assured stockholders that Driven's "proven M&A playbook" was "delivering" in its "glass businesses."

157.    These statements were materially false and misleading. It was false and misleading for the Individual Defendants to tout Driven's "progress over the first 180 days" since acquiring AGN; to state that Driven's "proven M&A playbook" was "delivering" in acquiring, integrating, and consolidating the auto-glass platform; and to tout Driven's "good progress" in attracting insurance customers to "our glass capabilities" when, in truth, (i) Driven's auto-glass integration was beset by severe problems, including fundamental deficiencies in the critical platform POS system, that significantly expanded Driven's integration timeline and prevented it from adding or servicing many important customers, including insurers; (ii) AGN's POS system, the erection of which was a critical gating step to further integration, would have to be rebuilt from scratch, causing significant delays in integration and, thus, in growth and profitability; (iii) even once the POS system was constructed, which would not be completed until after Driven's deadline

to complete all integration, integration would still only be 50% complete; (iv) these delays were having a significant negative impact on the auto-glass business' performance because huge swaths of the Company's acquired businesses could not even communicate with the AGN platform, Driven was unable to service key customers thus losing present and prospective business, and Driven was unable to integrate its new acquisitions, which negatively impacted revenue and earnings growth.

### 3. Materially False and Misleading Statements During the Fourth Quarter of 2022

158. On Driven's October 26, 2022 earnings call, defendant Fitzpatrick stated that "we continued to make significant progress across our key growth levers [including] glass, leveraging our proven playbook."

159. These statements were materially false and misleading. It was false and misleading for the Individual Defendants to tout Driven's "significant progress" in integrating Driven's auto-glass business when, in truth, (i) Driven's auto-glass integration was beset by severe problems, including fundamental deficiencies in the critical platform POS system, that significantly expanded Driven's integration timeline and prevented it from adding or servicing many important customers, including insurers; (ii) AGN's POS system, the erection of which was a critical gating step to further integration, would have to be rebuilt from scratch, causing significant delays in integration and, thus, in growth and profitability; (iii) even once the POS system was constructed, which would not be completed until after Driven's deadline to complete all integration, integration would still only be 50% complete; (iv) these delays were having a significant negative impact on the auto-glass business' performance because huge swaths of the Company's acquired businesses could not even communicate with the AGN platform, Driven was unable to service key customers thus losing present and prospective business, and Driven was

unable to integrate its new acquisitions, which negatively impacted revenue and earnings growth.

      **4.    Materially False and Misleading Statements During the First Quarter of 2023**

160.    On Driven's February 22, 2023 earnings call, defendant Fitzpatrick assured stockholders that construction of the glass platform itself was complete, stating that the Company "did a phenomenal job in 2022 building out that platform from zero to becoming the second largest player in the United States."

161.    This statement was materially false and misleading. It was misleading for the Individual Defendants to state that Driven had done a "phenomenal job" "building out" its auto glass "platform" in 2022 when, in truth, (i) construction of Driven's "platform" was not complete—it was not even functional, was beset by fundamental issues, was run through a POS system that would need to be rebuilt entirely, and could not service critical customers, including insurers; (ii) Driven's auto-glass integration was beset by severe problems, including fundamental deficiencies in the critical platform POS system, that significantly expanded Driven's integration timeline and made it impossible for the Company to add new companies or service important customers, including insurers; (iii) AGN's POS system, the erection of which was a critical gating step to further integration, would have to be rebuilt from scratch, causing significant delays in integration and, thus, in growth and profitability; (iv) even once the POS system was constructed, which would not be completed until after Driven's deadline to complete all integration, integration would still only be 50% complete; (v) these delays were having a significant negative impact on the auto-glass business' performance because huge swaths of the Company's acquired businesses could not even communicate with the AGN platform, Driven was unable to service key customers thus losing present and prospective business, and Driven was unable to integrate its new acquisitions, which negatively impacted revenue and earnings growth.

162.    On March 14, 2023, defendant Fitzpatrick attended the Bank of America Securities Consumer & Retail Conference on behalf of Driven. At that conference, defendant Fitzpatrick stated that Driven had "built out our North America auto glass platform" in 2022 and had "built a really nice sort of base platform in the Glass business."

163.    These statements were materially false and misleading. It was false and misleading for the Individual Defendants to state that Driven had already "built out" its "North American auto glass platform" and "built a really nice . . . base platform in the Glass business" when, in truth, (i) construction of Driven's "platform" was not complete—it was not even functional, was beset by fundamental issues, was run through a POS system that would need to be rebuilt entirely, and could not service critical customers, including insurers; (ii) Driven's auto-glass integration was beset by severe problems, including fundamental deficiencies in the critical platform POS system, that significantly expanded Driven's integration timeline and made it impossible for the Company to add new companies or service important customers, including insurers; (iii) AGN's POS system, the erection of which was a critical gating step to further integration, would have to be rebuilt from scratch, causing significant delays in integration and, thus, in growth and profitability; (iv) even once the POS system was constructed, which would not be completed until after Driven's deadline to complete all integration, integration would still only be 50% complete; (v) these delays were having a significant negative impact on the auto-glass business' performance because huge swaths of the Company's acquired businesses could not even communicate with the AGN platform, Driven was unable to service key customers thus losing present and prospective business, and Driven was unable to integrate its new acquisitions, which negatively impacted revenue and earnings growth.

**5.    Materially False and Misleading Statements During the Second Quarter of 2023**

164. On Driven's May 3, 2023 earnings call, defendant Fitzpatrick stated that Driven had "made significant progress integrating our 10 acquisitions" during the first quarter, explaining: "We've combined the best processes, procedures, and technology to inform our standard operating model that has been rolled out across the entire footprint." For her part, defendant Mason stated that Driven was "currently integrating our series of acquisitions under the Auto Glass Now brand name and implementing our new standard operating procedures" and that "we expect glass margins to expand from here as we integrate the business."

165. These statements were materially false and misleading. It was false and misleading for the Individual Defendants to state that Driven had "made significant progress integrating" its glass acquisitions and had already "combined the best processes, procedures, and technology to inform our standard operating model that has been rolled out across the entire footprint," and that Driven was Driven was "integrating our series of acquisitions under the Auto Glass Now brand name and implementing our new standard operating procedures" and Defendants "expect[ed] glass margins to expand from here as we integrate the business" when, in truth, (i) construction of Driven's "platform" was not complete—it was not even functional, was beset by fundamental issues, was run through a POS system that would need to be rebuilt entirely, and could not service critical customers, including insurers; (ii) Driven's auto-glass integration was beset by severe problems, including fundamental deficiencies in the critical platform POS system, that significantly expanded Driven's integration timeline and made it impossible for the Company to add new companies or service important customers, including insurers; (iii) AGN's POS system, the erection of which was a critical gating step to further integration, would have to be rebuilt from scratch, causing significant delays in integration and, thus, in growth and profitability; (iv) even

once the POS system was constructed, which would not be completed until after Driven's deadline to complete all integration, integration would still only be 50% complete; (v) these delays were having a significant negative impact on the auto-glass business' performance because huge swaths of the Company's acquired businesses could not even communicate with the AGN platform, Driven was unable to service key customers thus losing present and prospective business, and Driven was unable to integrate its new acquisitions, which negatively impacted revenue and earnings growth.

## VII.    THE FULLY SUSTAINED SECURITIES ACTION

166.    Based on the events and statements described above, on December 22, 2023, Driven stockholders initiated the Securities Action against the Company, defendant Fitzpatrick, and defendant Mason in this Court.

167.    The operative Securities Complaint, based in part on detailed accounts provided by confidential witnesses described herein, was filed on August 13, 2024.   The Securities Complaint asserts claims for violations of Sections 10(b) and 20(a) of the Exchange Act on behalf of a class of stockholders who purchased Driven common stock during the "Class Period", and challenges the same statements challenged herein. The defendants in the Securities Action subsequently filed a motion to dismiss, which was denied in its entirety notwithstanding the materially heightened pleading standards applicable pursuant to the PSLRA, by order dated February 20, 2025. Accordingly, the Securities Action is currently proceeding towards trial.

## VIII.   DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

168.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

169.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

170.     Shortly after the Securities Action was sustained in its entirety, on April 21, 2025, Plaintiff issued the Litigation Demand to the Board under Delaware law. *See* Exhibit A. Via the Litigation Demand, Plaintiff demanded that the Board undertake a reasonable, independent investigation in good faith and take action to remedy the harm caused by the misconduct described therein by any or all of the individuals identified as members of "Management".

171.     Counsel for the Board, Gibson Dunn, sent a letter dated May 27, 2025 to Plaintiff's counsel in response to the Litigation Demand. *See* Exhibit B.  Gibson Dunn's May 27, 2025 letter indicated that the Board had decided to "evaluate the Demand and any additional steps that may need to be taken in response thereto after the resolution of the Securities Action." *Id.* In other words, the Board had determined that it would defer any investigation or other action in response to Plaintiff's Litigation Demand indefinitely.

172.     Accordingly, the next day, May 28, 2025, Plaintiff's counsel sent an email to Gibson Dunn. *See* Exhibit C. Therein, Plaintiff's counsel stated that in light of the Board's determination to defer its investigation indefinitely, "consistent with its fiduciary duties, the Board must secure tolling agreements with each member of 'Management' identified in our client's demand so as ensure that the Company's claims are preserved. The statute of limitations applicable to the Company's breach of fiduciary duty claims under Delaware law is at least arguably set to expire in October 2025 (three years after the October 2022 disclosures described in the demand).  Accordingly, please let us know as soon as possible, and in any event no later than August 31, 2025, whether the Board has secured all necessary tolling agreements." *Id.*

173.     On August 6, 2025, Gibson Dunn responded to the May 28, 2025 email from Plaintiff's counsel, and therein stated that in light of earlier-filed derivative actions brought by other Driven stockholders who unlike Plaintiff had not made a pre-suit demand and allege demand

futility, the Board concluded there is "no need for the Company to enter into tolling agreements with any individuals." *Id*.

174.     This determination by the Board was and is wrongful. Plaintiff's derivative claims on behalf of Driven are not protected or preserved in any way by virtue of other purported stockholders' pending derivative actions, which are potentially subject to dismissal for failure to make demand, and/or as a result of those stockholders disposing of their Driven shares and therefore lacking standing to pursue Driven's claims during or after the Board's indefinite "deferral" of Plaintiff's Litigation Demand.

175.     Claims for relief belonging to the Company are, of course, valuable corporate assets. Directors of Delaware corporations, such as Driven, are duty-bound at all times to protect and preserve the corporation's assets.

176.     The Board, in response to Plaintiff's demand that tolling agreements be timely secured given the Board's indefinite deferral, has expressly refused to do so. Accordingly, the Board has either acted recklessly by failing to promptly take the reasonable, basic steps necessary to ensure Driven's claims can be timely asserted, or worse, that the Board deliberately chose to try to "run out the clock" and protect the Individual Defendants from the consequences of their misconduct.

177.     In either case, the Board's refusal to investigate at all and inform itself at this time, coupled with its refusal to secure tolling agreements despite Plaintiff's explicit demand for tolling agreements under those circumstances, amounts to a wrongful refusal of the Litigation Demand and a failure to take basic steps to protect and preserve the Company's corporate assets, in violation of the Board's fiduciary duties to Driven and its stockholders.

178.     The Board's dereliction of duty has left Plaintiff with no choice but to initiate this

derivative action at this time to ensure that the Company's valuable claims for relief based on the allegations in the Litigation Demand are properly and timely asserted. Accordingly, this derivative action should proceed.

## COUNT I

**For Violations of Section 14(a) of the Exchange Act Against the Individual Defendants**

179.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

180.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that:

[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

181.     SEC Rule 14a-9 provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

182.     Under the direction and watch of the Individual Defendants, the Company issued materially misleading statements in its Annual Proxy Statements filed with the SEC and disseminated to stockholders on April 8, 2022 and March 29, 2023 ("the 2022 and 2023 Proxies"). Specifically, the 2022 and 2023 Proxies contained false statements concerning the adequacy of the Company's risk oversight function and its internal controls over financial reporting.

183.     The 2022 and 2023 Proxies were used to solicit shareholder votes in connection with the election of Board members, certain of whom are Individual Defendants named herein. In addition, the 2022 and 2023 Proxies were used to solicit advisory votes to approve the

compensation of, among others, defendants Fitzpatrick and Mason. While the shareholder votes were non-binding, the 2022 and 2023 Proxies indicated that "the Compensation Committee and Board of Directors values the opinions of our stockholders and will consider the results of the vote in determining the compensation of the NEOs and the Company's compensation programs generally."

184.     With respect to the Company's "Executive Compensation Philosophy," the 2022 Proxy and the 2023 Proxy both indicate that executive compensation is performance-based. For instance, the 2022 Proxy states that "[c]ompensation opportunities are designed to align executives' pay with our performance and are focused on producing sustainable long-term growth."

185.     The materially false and misleading statements regarding the Company's risk oversight function and internal controls therefore misleadingly induced shareholders to vote in favor of the election of certain of the Individual Defendants to the Board, and performance-based compensation to Defendants Fitzpatrick and Mason, to which they were not entitled.

186.     The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

187.     No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## COUNT II

**Against Defendants Fitzpatrick and Mason for Contribution Under Sections 10(b) and 21D of the Exchange Act**

188.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

189.     Driven, along with defendants Fitzpatrick and Mason (the "Officer Defendants"), are named as defendants in the fully sustained Securities Action, which asserts claims under the

federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

190.    The Securities Action alleges that the class members relied, directly or indirectly, upon the false and misleading statements and omissions, as alleged herein, in purchasing Driven securities. The Securities Action further alleges that, as a direct and proximate result, the class members suffered damages because the value of their investments were artificially inflated by the false and misleading statements and omissions, they purchased such securities at the artificially inflated prices, and the value of their investments fell when the truth was eventually revealed, causing economic losses to the class members.

191.    The Securities Complaint was sustained in its entirety by this Court, notwithstanding the materially heightened pleading standards applicable pursuant to the PSLRA.

192.    If and when the Company is ultimately found liable in the Securities Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Officer Defendants' willful and/or reckless violations of their obligations as officers and/or directors of the Company.

193.    The Officer Defendants, because of their positions of control and authority as senior executive officers of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Action.

194.    Accordingly, the Officer Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

195.    As such, the Company is entitled to receive all appropriate contribution or indemnification from the Officer Defendants.

## COUNT III

### Breach of Fiduciary Duty Against the Individual Defendants

196.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

197.    The Individual Defendants, as current or former Driven officers and/or directors, owe (or owed) the Company the fiduciary duties of due care, loyalty, good faith, candor, oversight, reasonable inquiry, and supervision.

198.    By virtue of their positions as Driven directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein.

199.    Each Individual Defendant was required to: (a) use his or her ability to control and manage Driven in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of Driven rather than his or her own interests.

200.    By their acts alleged herein, including but not limited to causing Driven to issue false and misleading statements while concealing material adverse information and failing to ensure that the Company maintained adequate internal controls regarding financial disclosures, the Individual Defendants each breached their fiduciary duties.

201.    The Individual Defendants acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

202.    Driven has been injured as a direct and proximate result of the Individual

Defendants' wrongful conduct.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

203.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

204.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Driven.

205.    Plaintiff, as a shareholder and representative of Driven, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, salaries, benefits and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT V

### Breach of Fiduciary Duty Against the Demand Defendants

206.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.    The Demand Defendants acted unreasonably and in bad faith by explicitly refusing to secure tolling agreements despite their decision to delay and investigation or response to Plaintiff's Demand indefinitely, placing the Company's claims at risk.

208.    As a direct and proximate result of the breaches of duty alleged herein, Driven has sustained and will sustain significant damages.

209.    As a result of the misconduct alleged herein, the Demand Defendants are liable to the Company.

210.    Plaintiff, on behalf of Driven, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.      Directing Driven to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders holders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

C.      Awarding to Driven restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Date: October 7, 2025

**LAW OFFICES OF JAMES SCOTT FARRIN**

*s/ Gary W. Jackson*
Gary W. Jackson
NC Bar No.: 13976
555 S. Mangum Street, Suite 800
Durham, North Carolina 27701
T: (919) 688-4991
gary.jackson@farrin.com

**SHUMAN, GLENN & STECKER**
Rusty E. Glenn
600 17th Street, Suite 2800 South
Denver, CO 80202
(303) 861-3003
rusty@shumanlawfirm.com

**SHUMAN, GLENN & STECKER**
Brett D. Stecker
326 W. Lancaster Avenue
Ardmore, PA 19003
(303) 861-3003
brett@shumanlawfirm.com

**KASKELA LAW LLC**
D. Seamus Kaskela
Adrienne Bell
18 Campus Blvd., Suite 100
Newtown Square, PA 19073
(888) 715-1740
skaskela@kaskelalaw.com
abell@kaskelalaw.com

*Counsel for Plaintiff John Kalimon*

69

## <u>DRIVEN BRANDS HOLDINGS, INC. VERIFICATION</u>

I, John Kalimon, hereby verify that I am familiar with the allegations in the Verified Stockholder Derivative Complaint and that I have authorized the filing of the Verified Stockholder Derivative Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: 9/30/2025

Signed by:

*John M. Kalimon*
27DB63BF3CB04CC...

JOHN KALIMON